**Henry SILVER and Bessie Silver,
Plaintiffs,**

v.

**UNITED STATES of America,
Defendant.**

No. 815.

United States District Court
D. Montana,
Missoula Division.

Jan. 31, 1963.

478

Higgins & Pierson, Missoula, Mont., George E. Bridwell, Salt Lake City, for plaintiffs.

Louis F. Oberdorfer, Asst. Atty. Gen., Tax Division, Dept. of Justice, Burton Schwalb, and Joyle C. Dahl, Attys., Tax Division, Washington, D. C., and Moody Brickett, U. S. Atty., Butte, Mont., for defendant.

MURRAY, Chief Judge.

This is an action brought by the plaintiffs for the recovery of federal income taxes alleged to have been illegally assessed against and collected from them by the defendant in the amount of $30,507.98 for the calendar year 1953. The court has jurisdiction of the action under 28 U.S.C. 1346(a) (1).

The case was submitted to the court upon a Stipulation of Facts filed November 8, 1961, and a Supplemental Stipulation filed October 18, 1962, and the court adopts the facts set forth in said stipulation as its findings of fact, in addition to the findings and conclusions hereinafter set forth.

The only issue involved is whether amounts received by the plaintiffs from their family-owned corporation in exchange for some of their shares of stock were capital gains, and entitled to capital gains treatment taxwise, or whether such amounts were essentially equivalent to a dividend and taxable as ordinary income. Since the transaction involved occurred in 1953, this case is governed by the Internal Revenue Code of 1939.

As of January 1, 1953, and for some years prior thereto, the plaintiffs, together with their son, F. M. Silver, owned all but one share of the capital stock of the Modern Plumbing and Building Supplies Corporation, a Montana Corporation. The corporation held the remaining one share as treasury stock. On January 1, 1953, the number of shares and percentage of stock owned by the three shareholders (exclusive of the single share held by the corporation) were as follows:

Henry Silver— 176 shares 9.74%
Bessie Silver—1140 shares 63.09%
F. M. Silver— 490 shares 27.12%

On January 2, 1953, at a special stockholders' meeting, the plaintiffs Bessie and Henry Silver offered to sell to the corporation an aggregate of 470 shares of their stock, 370 of which belonged to Bessie and 100 to Henry, at a price of $146.94 per share, its book value, or a total of $69,061.80. The offer was accepted, but when the transaction was finally consummated, however, the plaintiffs received only $60,000 face value of U. S. Government bonds and $245.40 cash for their 470 shares of stock. Immediately upon receiving the $60,000 face value worth of government bonds, the plaintiffs sold them for $54,675, which was the fair market value of the bonds at the time plaintiffs received them.

In reporting this transaction in their 1953 income tax return plaintiffs treated it as a capital gain and computed and paid the tax accordingly. The mechanics and mathematics of the computation are not at issue here, since the parties have

agreed on the amount of refund due if plaintiffs prevail. However, the Commissioner of Internal Revenue determined that the sum received for the 470 shares was essentially equivalent to a dividend under the provisions of § 115(g) of the 1939 Internal Revenue Code (26 U.S.C., 1952 ed., § 115), and taxable as ordinary income, and assessed and collected the additional tax in the amount of $30,507.98, the recovery of which is herein sought.

Section 115(g) of the 1939 Code provides:

"(g) *Redemption of stock.*

(1) *In general.* If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend."

Section 39.115(g)–1(a) (2) of Treasury Regulations 118 promulgated under the 1939 Internal Revenue Code provides that the question of whether a distribution in connection with a redemption of stock is essentially equivalent to the distribution of a taxable dividend depends upon the circumstances of each case. However, there have been established by the courts, and particularly the Ninth Circuit in a series of cases, the criteria to be used in determining in each case whether a distribution is essentially equivalent to a dividend. Hirsch v. Commissioner, C.A. 9–1941, 124 F.2d 24; Earle v. Woodlaw, C.A. 9–1957, 245 F.2d 119; and Pacific Vegetable Corp. v. Commissioner, C.A. 9–1957, 251 F.2d 682. These criteria or tests for determining whether a distribution is essentially equivalent to a

dividend are succinctly stated in Earle v. Woodlaw, supra, at page 126, and the evidence in this case will be considered in the light of those criteria, bearing in mind that the Commissioner's determination is presumptively correct and the burden of proof is on the taxpayers here to show that the distributions were not essentially equivalent to a taxable dividend. Hirsch v. Commissioner, supra.

The first two of these criteria are somewhat similar and may be considered together in this case. They are

1. Did the corporation adopt any plan or policy of contraction of its business activities?

2. Did the corporation follow an orderly procedure looking toward its ultimate dissolution or its ultimate contracted operation?

Both of these questions must be answered in the negative. The income tax returns of Modern Plumbing and Building Supply Corporation for the years 1953 to 1960, submitted as exhibits with the supplemental stipulation show that the corporation's business and profits grew substantially after the stock redemption in 1953. Thus, its net income before taxes went from $45,222.46 in 1953 to a high of $149,529.44 in 1957, and though there was a decline, the income before taxes was $108,464.55 in 1960, more than double that of 1953, the year of stock redemption. There is no other evidence in the record showing any curtailment or contraction of the company's activities.

3. Did the initiative for the corporate distribution come from the corporation, based on usual business considerations, or did it come from the stockholders for their own purposes?

There is no evidence of any business purpose of the corporation in making the distribution. Likewise there is no evidence as to the purpose of the plaintiff stockholders in causing the distribution

to be made, but it is clear from the record that the plaintiff stockholders initiated the transaction. The minutes of a special stockholders' meeting of January 2, 1953, contains the following statement:

"The matter came up as between Henry Silver and Bessie Silver, who offered 470 shares of their capital stock to the corporation at its book value as of December 11, 1952. After considering this offer by the stockholders and it being in general the desire of the company not to interrupt or decrease its capital structure, a motion was duly made and seconded and unanimously adopted, that the company purchase on its own account, the 470 shares of stock from Henry and Bessie Silver at the present book value of $146.94 per share and to reissue said stock to the company, to be held as Treasury stock."

Not only does this entry in the minutes establish that the initiative for the redemption rested with the plaintiff stockholders, but the last sentence of the minute entry above quoted is further evidence that the corporation had not adopted any plan or policy of contraction of its business activities and that the distribution was not made as part of any such plan or policy.

4. Is the proportionate ownership of stock by the stockholders changed?

This answer is likewise in the negative. In Pacific Vegetable Oil Corp. v. Commissioner, 251 F.2d 682, 685, the Court of Appeals for the Ninth Circuit said:

"[i]f the control of the distributing corporation or the relative position of the principal shareholders of the distributing corporation as a practical matter remains the same after the redemption as before, this fact is indicative that the distribution was essentially equivalent to a taxable dividend. Commissioner of Internal Revenue v. Roberts, supra

[203 F.2d 304]; Boyle v. Commissioner, supra [187 F.2d 557].

"Before the redemption Pacific Vegetable held 40.4% of Western's outstanding shares, and needed the concurrence of A. Schumann to control Western; after the redemption, Pacific Vegetable owned 50% of Western's outstanding shares, and needed the concurrence of A. Schumann to control Western. This essential relation of Pacific Vegetable and A. Schumann, the principal shareholders, remained substantially the same after the redemption."

In the present case, while there was some change in percentage of stock ownership as a result of the redemption, the essential relation of all the shareholders in the corporation remained substantially the same after the redemption. The percentage of ownership of the stock of Modern Plumbing by its three stockholders before and after the redemption is as follows:

|  | Before | After |
|---|---|---|
| Henry Silver | 9.74% | 5.69% |
| Bessie Silver | 63.09% | 57.59% |
| F. M. Silver | 27.12% | 36.65% |

Both before and after the redemption Bessie Silver held sufficient stock to control the corporation, and both before and after the redemption neither of the other stockholders, individually or in combination, had sufficient stock to control. Thus the essential relation of all of the stockholders to themselves and the corporation was unchanged.

In this connection the plaintiffs argue that because the distribution was not made pro rata among all the stockholders that it cannot be held to be equivalent to a taxable dividend. In Hirsch v. Commissioner, 124 F.2d 24, 29, the Court of Appeals for the Ninth Circuit said, "it is immaterial that the distribution may not have been extended to all shareholders, or divided among stockholders other than in proportion to their respective holdings," citing Lincoln Nat. Bank v. Burnet, 61 App.D.C. 354, 63

F.2d 131, 133. In the Lincoln National Bank case, the court said:

"It is true that the directors considered it in part as a gift and not as a dividend, but this is not determinative of the nature of the distribution, nor is the fact that the distribution was to some of the shareholders only and not to others, nor that it was divided among the stockholders in proportions other than their respective holdings of stock in the corporation. The other shareholders have not complained of this inequality, and must therefore in this proceeding be deemed to have ratified the distribution. The character of the distribution as a division of profits was not changed by the manner in which it was accomplished, nor by the personal motives which induced the respective stockholders or directors to approve of such action, for it nevertheless remained in contemplation of law a distribution of dividends."

There is no evidence in this record that the remaining shareholder, F. M. Silver has complained of the distribution made to plaintiffs and in this proceeding he too must be deemed to have ratified it.

The next criterion is

5. What were the amounts, the frequency and the significance of dividends paid in the past?

The corporation was incorporated in 1936 under the name of American Fur and Hide Company and the name was changed to Modern Plumbing and Building Supplies Corporation in 1945. From the time of its incorporation until the stock redemption in 1953, the only dividends declared were a $63,245 cash dividend in 1948, a $63,210 cash dividend in 1949, and a 75% stock dividend in 1946, which was accompanied by an authorized increase in the capital stock of the corporation from $150,000 to $300,000, and earnings of the corporation were capitalized in the amount of the stock dividend. This record of dividend payments is particularly significant in the light of the fact that on January 1, 1953, the day before the stock redemption, the corporation had on hand for the payment of dividends $84,742.22 of earned surplus and undivided profits.

6. Does the capitalization, at the time of the purchase of the stock, represent capital paid in or earnings from the business?

A substantial portion of the corporation's capital was made up of capitalized earnings resulting from the 75% stock dividend declared in 1946. The amount of earnings capitalized by reason of the stock dividend in 1946 was $77,400, based on the issuance of 774 new shares with a par value of $100 per share. This amount of capitalized earnings exceeds the amount of the distribution made to the plaintiffs in the transaction in question.

7. Was there a sufficient accumulation of earned surplus to cover the distribution or was it partly from capital?

As pointed out above there was more than a sufficient amount of earned surplus and undivided profits to cover the distribution. The distribution amounted to only $60,245.40, considering the U. S. Government bonds at their face value, while the earned surplus and undivided profits on hand amounted to $84,742.22.

8. Was there a maintenance of a relatively similar amount of capital liability, or did that figure decrease to a degree somewhat comparable to the purported distribution of capital?

The capital liability remained the same after the purchase of the stock as it was before.

9. Was there good faith or bad in the action of the Board of Directors (or stockholders in this case) in making the distribution?

There is no evidence touching the bona fides of this transaction, but as

pointed out in Earle v. Woodlaw, supra, at page 128, this criterion, formerly held important in earlier cases, is now considered to be of such little importance that it is practically immaterial, because the question of whether a distribution is essentially equivalent to a taxable dividend does not depend on the presence or absence of honesty in distribution, but the question is one of equivalents, and if that is present, distribution is taxable.

The final and most important criterion to be applied is:

10. What was the net effect of the action taken?

As Judge Barnes pointed out in Earle v. Woodlaw, supra, at page 129, if the purchase of its own stock by the corporation accomplishes the same result as the declaration of a dividend, a gain derived by a stockholder therefrom is taxable as a dividend. That is the precise situation here. The purchase of plaintiffs' stock by the corporation accomplished the same result as the declaration of a dividend. It resulted in the distribution to the plaintiff stockholders of $60,245.40 (again considering the bonds at face value) of earned surplus and undivided profits by the corporation out of a total of $84,742.22 of such surplus and profits which the corporation had on hand; the capital of the corporation remained unchanged by the payment; the business of the corporation continued and grew after the purchase, both in volume of sales and in profits; the minutes of the stockholders' meeting, where the transaction was approved, show affirmatively that the purchase was not made as part of a plan or policy of contraction of the business or its ultimate dissolution, and on the contrary that the desire of the company was that its capital structure be not interrupted or decreased. Taking all of these things into consideration, it is clear that the net effect of the transaction was to transfer from the corporation to the plaintiff stockholders profits which had been accumulated over some time, and that such distribution was equivalent to a dividend and taxable as ordinary income, and the court so holds.

Counsel for defendant will prepare a form of judgment in accordance with Rule 11 of the Rules of this Court.